UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

AMANDA L. JONES                                             PLAINTIFF

v.                                        CIVIL ACTION NO. 3:13-CV-708-DW

CAROLYN W. COLVIN, Acting Commissioner of Social Security          DEFENDANT

## MEMORANDUM OPINION

Plaintiff Amanda L. Jones has filed a complaint pursuant to 42 U.S.C. §405(g) to obtain

judicial review of a final decision of the Commissioner of Social Security that denied her

applications for disability insurance benefits (DIB) and supplemental security income (SSI).

Jones applied for DIB and SSI on May 8, 2012, alleging that she was disabled as of Jan. 7, 2012,

due to attention deficit-hyperactivity disorder (ADHD), depression, bipolar and anxiety

disorders, panic disorder with agoraphobia, thyroid disease and a bulging cervical disk (Tr. 205).

The Commissioner denied Jones's claims on initial consideration (Tr. 94-102, 105-117) and on

reconsideration (Tr. 159-162, 163-165).  Jones requested a hearing before an Administrative Law

Judge (ALJ) (Tr. 166).

ALJ Roland D. Mather conducted a hearing in Louisville, Kentucky, on March 8, 2013

(Tr. 33-58).  Jones attended with her attorney, Alvin Wax (Tr. 33).  Jones and vocational expert

(VE) Sharon lane testified at the hearing (Tr. 36-53, 53-58).  Following the conclusion of the

hearing, ALJ Mather entered a hearing decision on March 22, 2013, that found Jones is not

disabled for the purposes of the Social Security Act (Tr. 19-29).

In his adverse decision, ALJ Mather made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act
        through March 31, 2015.

2. The claimant has not engaged in substantial gainful activity since Jan. 7, 2012, the alleged onset date (20 C.F.R. 404.1571, *et seq.* and 416.971, *et seq.*).

3. The claimant has the following severe impairments: history of attention deficit/hyperactivity disorder (ADHD), depression, bipolar disorder, anxiety disorder, and panic disorder with agoraphobia (20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: understanding, remembering, and carrying out simple, familiar instructions that require no more than brief learning periods; sustaining concentration, persistence or pace with limited independent judgment and minimal variation for 2-hour segments in an 8-hour workday; interacting with co-workers and supervisors for task completion; and no more than occasionally interacting with the general public.

6. The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7. The claimant was born on Feb. 22, 1982, and was 29-years-old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, App. 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from Jan. 7, 2012, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. 19-29). Jones sought review of the hearing decision by the Appeals Council (Tr. 14-15). The Appeals Council denied her request for review, finding no reason under the Rules to review ALJ Mather's decision (Tr. 1-6). The present lawsuit followed.

**The Five-Step Sequential Evaluation Process.**

Disability is defined by law as being the inability to do substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. See, 20 CFR §§ 404.1505, 416.905(a). To determine whether a claimant for DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed. 20 CFR §§ 404.1520, 916.920(a). At step 1, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the claimant to be not disabled. See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971. *See, Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step 2 of the evaluation process whether the claimant has a severe impairment or combination of severe impairments that significantly limit his or her ability to perform basic work activities. See 20 CFR §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the impairments of the claimant are determined by the Commissioner to be non-severe, in other words, so slight that they could not result in a finding of disability irrespective of a claimant's vocational factors, then the claimant will be

determined to be not disabled at step 2.  *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart B of Part 404 of the federal regulations. 20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined to be automatically disabled without consideration of his or her age, education or work experience if the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix.  *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work.  20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989).  A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3)  The burden switches to the Commissioner at step 5 of the sequential evaluation process to establish that the claimant, who cannot return to his or her past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience.  See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999).

Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."

**Standard of Review.**

Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g). The statute, and case law that interprets it, require a reviewing court to affirm the findings of the Commissioner if they are supported by substantial evidence and the Commissioner has employed the appropriate legal standard. *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.). Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*). It is more than a mere scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000). So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the federal court even if the record might support a contrary conclusion. *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th

Cir. 1989). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).

**Issues for Review.**

Jones in her fact and law summary makes no objection to the four initial findings of fact contained in ALJ Mather's decision (DN 12, p. 1) (Tr. 21-22). In other words, Jones does not disagree with ALJ Mather's findings concerning the first three steps of the sequential evaluation process. More specifically, she does not dispute the impairments that the ALJ identifies as being severe, which include her ADHD, depression, bipolar disorder, anxiety disorder and panic disorder with agoraphobia (Tr. 21). She also does not challenge his conclusion that her hypothyroidism, bacterial bronchitis and bulging disk are not severe impairments (Tr. 22). Jones agrees that her severe impairments, alone or in combination, do not meet or medically equal any of the impairments contained in the listing of impairments in 20 C.F.R. Part 404, Subpart P, Appx. 1, as ALJ Mather found. Finally, she does not object to findings of fact 6, 7 or 8 of the hearing decision (DN 12, p. 8). These findings indicate, respectively, that Jones is unable to resume her past relevant work, is a younger individual who has a limited education and is able to communicate in English (Tr. 27-28).

Jones does object to finding of fact no. 5 of the hearing decision. In this finding, ALJ Mather determined that Jones retains the residual functional capacity (RFC) to perform a full range of work at all exertional levels with certain non-exertional limitations that include: understanding, remembering and carrying out simple, familiar instructions that require no more than a brief learning period; sustaining concentration, persistence or pace with limited

independent judgment and minimal variation for 2-hour segments in an 8-hour workday; interacting with co-workers and supervisors for task completion, and no more than occasionally interacting with the general public (Tr. 23-24). Jones raises a number of arguments in her effort to show that finding of fact no. 5 is not supported by substantial evidence, and that ALJ Mather erred in his analysis in this portion of the hearing decision (Tr. 24-27).

First, Jones maintains that ALJ Mather erred in his reliance on her irregular attendance for individual and group therapy at Seven Counties Services, as a basis to conclude, without explanation, that she remains capable of performing substantial gainful activity with the above-noted restrictions. Jones contends that ALJ Mather failed to address in his opinion the critical question of whether her failure to regularly attend therapy, or to comply with her medication regimen, was the result of her severe mental impairments.

Citing 20 C.F.R. §§404.1530 and 416.930, Jones maintains that ALJ Mather never attempted to determine during the administrative hearing if she had acceptable reasons for her failure to follow her prescribed treatment for depression, bipolar disorder, anxiety and panic disorder with agoraphobia. Jones points out in this regard that S.S.R. 82-59 directs that a claimant who has not complied with prescribed treatment should be afforded the opportunity to explain to the ALJ the specific reasons for her failure to do so. *See Renneker v. Astrue*, 2011 WL 2559515 at *11 (S.D. Ohio 2011)(" The ALJ erred by determining that plaintiff was noncompliant with her treatment and medication without addressing whether her noncompliance was a result of one of her severe mental impairments.") Her noncompliance, Jones notes, under *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989), may not be the sole basis for denial of her disability claim if it was caused by her numerous mental impairments.

In this respect, Jones points out that nowhere does ALJ Mather provide an explanation in his hearing decision for his determination that her noncompliance with treatment and medication was not the result of her mental impairments. Jones insists that her agoraphobia, as she repeatedly testified, is what severely affects her ability to travel independently outside of her home (Tr. 52-53). She must be accompanied by someone whenever she leaves her home, or otherwise she will not ordinarily go out by herself (Id.). This significant limitation, the direct result of her severe agoraphobia, is the primary reason for Jones's missed therapy appointments. Because ALJ Mather never afforded her the opportunity to explain why she missed a number of her therapy appointments at Seven Counties Services, or why she was noncompliant on occasion with her medications, Jones now contends that the ALJ improperly relied upon these two circumstances to reject her claims for DIB and SSI in violation of the above-cited rulings and case law. Accordingly, she asks that her case be remanded for appropriate development on this critical issue.

Second, Jones maintains in her fact and law summary that ALJ Mather "inextricably intertwined" his evaluation of her credibility with his evaluation of her functional restrictions. (DN 12, p.3)...According to Jones, the ALJ's discussion of her lack of compliance with counseling and medication was relied on interchangeably in both the credibility evaluation and the evaluation of her functional restrictions without a "delineation between the credibility finding and the RFC determinations." (DN 12, p. 3). This approach in her view mistakenly conflates two distinct issues without adequately addressing either one. See, *Carr v. Colvin,* 2013 WL 1309094 at ** 23-26 (M.D. Tenn. Mar 12, 2013) Adopted by *Carr v. Colvin*, 2013 WL 1284326 (M.D.Tenn. Mar 28, 2013)(ALJ erred to claimant's prejudice when he "inextricably intertwined" credibility determination based on claimant's noncompliance with blood pressure medication

with analysis under 20 C.F.R. § 404.1530, the regulation on the need to follow prescribed treatment).

In her third argument, Jones contends that ALJ Mather used an improper standard when he evaluated her subjective complaints. Jones points to that language of the hearing decision in which the ALJ writes, "The objective evidence of records does not substantiate the degree of the claimant's complaints of allegedly disabling symptoms." (Tr. 24). Jones argues that this substantial reliance on objective evidence is in error as the intensity and persistence of her mental impairments simply are not an exclusive matter of objective evidence alone. She cites in this regard 20 C.F.R. §404.1529(c)(3); SSR 96-4p and 96-7p; *Jones v. Sec'y*, 945 F.2d 1365, 1369-70 (6th Cir. 1991)(" There are situations in which an individual's alleged or reported symptoms, such as pain, suggest the possibility of a greater restriction of the individual's ability to function than can be demonstrated by objective medical evidence alone.").

Jones is equally questioning of that portion of ALJ Mather's decision in which he maintains that Jones's daily activities are "not as limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 24). Jones asks what "one would expect" her daily activities to be under the circumstances; and, how would such entirely subjective standard, which is not explained in the record, be applied to her under the regulations. She argues that the ALJ's reliance on her mere ability to physically care for her three minor daughters in their home, which the ALJ opined without citation to the record, is "quite demanding both physically and emotionally," simply does not translate into an ability to perform substantial gainful activity *outside* the home in the workplace. *Nelms v. Gardner*, 386 F.2d 971, 973 (6th Cir. 1967).

Fourth, Jones contests ALJ Mather's conclusion that when she did comply with her mental health treatment and medication regimen, she showed improvement. Jones points out that even ALJ Mather characterized the effectiveness of her treatment as being only "relatively effective." (Tr. 25). This characterization in her view stands in direct contrast to the conclusions found in the annual review of her treatment by Seven Counties Services, which on the most recent assessment dated Nov. 7, 2012, conclude that the modality of treatment-- group therapy and medication-- had **not** proven effective (Tr. 389)(emphasis added). Jones notes that the same annual review reflects her need for continued treatment, observing that claimant "continues with poor mood swings - - isolates - - hates leaving home - - condition has digressed - - more depressed." (Tr. 390). She points out that nowhere in this annual review is there any indication that her noncompliance with attendance or medication is intentional, as opposed to being a consequence of her agoraphobia and other severe mental illness.

Finally, Jones turns to the consultative psychological examination reports obtained from Jessica Huett, Psy.D. (Tr. 269-74) and Richard L. Klem, Ph.D. (Tr. 371-380). Jones contends that ALJ Mather rejected Dr. Klem's favorable opinion as being "not entirely consistent with the objective medical evidence of the record as a whole," when in fact ALJ Mather did not factually identify any such inconsistent objective medical evidence. Objective medical evidence, in any event, according to Jones, could not be used as the sole basis for the appropriate evaluation of the limiting effects of her mental impairments.

To the extent that ALJ Mather rejected the opinion of Dr. Klem because it rested in part on Jones's own subjective report of her symptoms and her reported limitations, Jones points out that a psychological examination by its very nature requires an examiner to rely on the subjective reports of the examinee. Jones insists that the record as a whole strongly corroborates her

subjective reports of anger management problems, isolation, agoraphobia, panic attacks and stress-related attendance problems (Tr. 282, 285, 345-46, 371-74, 376, 388, 390). Based on such facts, Dr. Klem found Jones had only a "poor-to-fair ability to adapt to pressures and changes in the workplace," and would be expected to have "considerable difficulty and distress interacting with others." (Tr. 379) Accordingly, Jones maintains there are no contradictory factual findings in the record that undercut the conclusions of Dr. Klem's report.

Furthermore, Jones insists that the conclusions obtained by Dr. Klem in his report of July 16, 2012 (Tr. 371-380), are materially consistent with the earlier conclusions obtained by Dr. Jessica Huett in her own examination report of Nov. 3, 2008 (Tr. 269-74). Although ALJ Mather rejected the conclusions of Dr. Huett's earlier report, solely based on it being rendered three years prior to the alleged onset date of her disability, Jones argues the diagnosis of Dr. Huett, and the non-exertional limitations found by Dr Huett, are identical with those of Dr. Klem.

Dr. Huett concluded, like Dr. Klem, that Jones has moderate-to-marked limitations in tolerating stress and pressures in the workplace, along with marked limitations in responding appropriately to supervision, co-workers and work pressure (Tr. 272). These conclusions by Dr. Klem and Dr. Huett are not only entirely consistent with one another, but also are consistent with the record as a whole, according to Jones. The mere fact that when isolated in her home she remains able to physically care for her minor children and can perform limited activities of daily living does not in Jones's view "have anything to do with her [difficulty with] interpersonal relationships with others." (DN 12, p. 8). ALJ Mather's decision nowhere explains, according to Jones, how she can get along with co-workers and supervisors during an 8-hour workday merely because she can clean her house, prepare meals for her children, or assist them with their

11

homework inside her home.  Jones incorporates all of the above arguments in her challenge to findings of fact 9, 10 and 11, and asks that her case be remanded for further development as it is not based upon substantial evidence.  Upon consideration, the Court agrees with Jones, the record has not be adequately developed in her case in light of the requirements of SSR 82-59 as discussed in the *Renneker,* and *Carr* decisions cited above.

**Finding of Fact No. 5.**

The central question raised by Jones in her fact and law summary, as noted above, is whether the RFC finding of ALJ Mather contained in finding of fact no. 5 (Tr. 23-27) is supported by substantial evidence and is in accordance with the law.  Residual functional capacity is defined by regulation as being "the most you can still do despite your limitations."  20 C.F.R. §§404.1545(a)(1), 416.945(a)(1).  *See Luteyn v. Comm'r of Soc. Sec.*, 528 F. Supp.2d 739, 750 (W.D. Mich. 2007) ("RFC is the most, not the least, a claimant can do despite his impairments.").  The Commissioner is required by regulation to assess a claimant's RFC "based on all the relevant evidence in [the claimant's] … record."  *Id*.  *See Bingham v. Comm'r*, 186 Fed. Appx. 624, 647-48 (6th Cir. 2006) ("The ALJ is ultimately responsible for determining a claimant's RFC based upon relevant medical and other evidence of record.").

In assessing a claimant's residual functional capacity, the Commissioner will consider all of his or her medically determinable impairments including both severe and non-severe impairments.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).  *See Reynolds v. Comm'r* , 424 Fed. Appx. 411, 417-18 (6th Cir. 2011) ("It is true that an ALJ must determine a claimant's residual functional capacity, considering 'numerous factors' including 'medical evidence, non-medical evidence, and the claimant's credibility.'") (quoting *Coldiron v. Comm'r*, 391 Fed. Appx. 435,

443 (6th Cir. 2010)). See also, SSR 96-5p, 1996 WL 374183 at *3 (July 2, 1996). It is the responsibility of the claimant to provide the evidence that the Commissioner will evaluate in making the RFC finding. See 20 C.F.R. §§404.1512(c), 416.912(c). The Commissioner also will consider any statements of the claimant provided by medical sources about what he or she remains able to do, as well as any descriptions or observations of the claimant's limitations caused by his or her impairments that are provided by the claimant, the claimant's family, friends or other persons. 20 C.F.R. §§405.1545(a)(3), 416.945(a)(3).

A finding of residual functional capacity is used at step 4 of the sequential evaluation process first to determine whether the claimant remains capable of performing his or her past relevant work. See 20 C.F.R. §§404.1520(f), 404.1560(b), 416.920(f) and 416.960(b). If the Commissioner determines that a claimant is not able to perform his or her past relevant work, or does not have past relevant work, then the RFC determination is used at step 5 of the sequential evaluation process to determine whether the claimant can adjust to any other work that exists in the national economy. See 20 C.F.R. §404.1520(g), 404.1566, 416.920(g) and 416.966. In this respect, the RFC assessment is used along with information concerning the claimant's vocational background in making the disability determination. *Id.*

Here, the critical questions raised by Jones in her fact and law summary do not involve her exertional capacity to perform a full range of alternative work. Jones does not challenge the hearing decision in this respect. Instead, the primary focus of her argument falls exclusively on the non-exertional limitations set forth in finding no. 5 of the hearing decision. Jones in particular insists that the current record fairly read as a whole, including the consultative examination results of both psychologists, Dr. Huett and Dr. Klem (Tr. 269-274, 371-380), along with her medical history of repeated psychiatric hospitalizations and ineffectual outpatient

mental health treatment, simply does not support the ALJ Mather's conclusion that she can perform substantial gainful activity that includes interacting with co-workers and supervisors for task completion or even occasionally interacting with the general public.

A thorough review of the existing record compels the Court to agree with Jones in this respect.  The decision of ALJ Mather is *not* supported by substantial evidence given:  (1) the failure of the ALJ to adequately develop the record on the questions of Jones' noncompliance with her psychotropic medications and treatment regimen at Seven County Services; and (2) the absence of adequate discussion of the claimant's medical history.

 The record when examined reveals that Jones, born Feb. 22, 1982, is a single, divorced mother with 3 daughters and a ten-grade education (Tr. 180, 186, 269, 283, 350-51, 376).  Her employment history is sporadic at best and includes brief employment at various times as a cashier (1999-2003), a fast food worker (2008, 2010), an exotic dancer (2007, 2010), and an office clerical worker (2011-2012).  Jones has never successfully performed employment for more than a year (Tr. 270). Her most recent job involved several months of part-time work for 9 hours a week as a home healthcare attendant (Tr. 36-39).

Medical records and examination reports reveal that Jones began to experience significant mood swings in her teenage years and that she described herself as being an emotionally abused child (Tr. 269, 374).  By the time that she was 26 years old, Jones had been placed in in-patient psychiatric hospital treatment on three different occasions. (Tr. 270).  She also had been receiving bi-monthly psychiatric treatment for a 2-year period.  (Id.).  Her psychotropic medications at that time included Xanax, Lithium, Effexor and Seroquel (Id.).

Despite this treatment, Jones reported to consultative psychological examiner Dr. Jessica Huett in November of 2008, that she had been arrested on five or six occasions, and had served

30 days in jail after attempting to run over her boyfriend with an automobile (Id.). Dr. Huett in

her observations of Jones, which the ALJ does not set forth in his opinion[1], observed pressured

speech, a coping deficit, variable concentration, distractable attention, restricted affect and

pessimistic mood (Tr. 271). Jones reported to Dr. Huett during the 2008 examination that she

stays mad, has a bad temper, can be destructive, has trouble getting along with people, stays

depressed, does not want to leave her home, experiences anxiety attacks in groups and is

impatient and irritable (Id.). Jones explained on that occasion that she has trouble working due

to her problems being around people (Id.).

Based on her clinical observations, Dr. Huett's diagnostic impression was bipolar

disorder and anxiety disorder. Significantly, Dr. Huett in the summary section of her

examination report, found that Jones's ability to tolerate stress and pressure of day-to-day

employment is affected by her mental impairments with moderate-to-marked limitations noted

(Tr. 272). Dr. Huett also found that Jones's ability to respond appropriately to supervision, co-

workers and work pressures in a work setting is affected by the same impairments with marked

limitations, as well (Id.). These significant findings are not included in the hearing decision of

ALJ Mather nor are they discussed in relation to the similar findings of Dr. Klem.

These findings of Dr. Huett, in fact, are strikingly similar to the findings obtained

approximately three years later by a separate consultative psychological examiner, Richard L.

Klem, Ph.D. (Tr. 371-380). Dr. Klem at the outset of his report noted a history of bipolar

disorder, anxiety, depression, ADHD, herniated cervical disk and thyroid disease (Tr. 371). At

the time of this July 16, 2012 examination, Jones was unemployed and had last worked as an

---

[1]  The opinion contains no substantive discussion of Dr. Huett's report (Tr. 269-74), which the ALJ dismisses
outright solely because it was rendered prior to the alleged onset date of Jones' disability, Jan. 7, 2012. (Tr 27).

office receptionist two years earlier, but reported that she could not perform full-time work due to her inability to get along with others, which had resulted in her being fired after only four days of employment from a brief, but failed, attempt to work as a bartender. (Tr. 371).

Dr. Klem observed Jones's speech to be slightly pressured, that she appeared to be tense with an anxious mood (Tr. 372). Jones reported significant mood swings and suicidal thoughts along with anxiety. As she explained, "I can't go out in public. I keep my kids in because I can't go around people. A lot of times I can't get to doctors' appointments because I can't bring myself on getting out of [the] house." (Tr. 374). Jones reported to Dr. Klem that she had no friends, that she had poor relationships with her supervisors and co-workers, as well as poor relationships with her neighbors (Tr. 375-76). Jones reported that when criticized in the workplace, her reaction would be to "scream at them [co-workers] or hit them." (Tr. 375).

As confirmation of these uncontrolled behaviors, Jones reported to Dr. Klem that she had admitted herself to inpatient psychiatric treatment at Our Lady of Peace in Louisville, Kentucky, on May 3, 2012 (Tr. 288-305), some two months prior to her consultative psychological examination by Dr. Klem. (Tr. 371-380). Her inpatient psychiatric treatment was noted by Dr. Klem to have only moderate benefit based on Jones's report (Tr. 374).

Psychiatric hospital records from Our Lady of Peace confirm that Jones appeared there for inpatient treatment on May 3, 2012, and remained until her discharge nine days later (Tr. 288). At the time of admission, Jones reported significant behavioral problems that included unstable emotions, anger outbursts and physical altercations (Tr. 288, 301). In Jones's words, it felt like she was "losing her mind." Jones acknowledged that she had gotten into a fight with a pizza delivery person over $3 and had punched him in the face two days earlier (Id.). Two weeks prior to that, Jones admitted that she had spit in the face of a man, apparently one of the

counselors at Seven Counties Services, during an altercation in the parking lot (Tr. 288, 301, 345-46).

Jones, who had been off of her psychotropic medication for approximately a year, related that she became angry at the littlest things and was scared that she was going to hurt someone (Tr. 288). Jones was immediately placed on medication of Saphris, Nueronton, Trazadone, Remeron and Strattera. Treatment notes indicate that she showed a "fairly decent therapeutic response." Nevertheless, her insight and judgment were noted to be significantly impaired, her mood anxious with suicidal ideation and a depressed mood that was "10 out of 10" on admission (Tr. 294, 301). Her Global Assessment of Functioning (GAF) score on admission was 20 and Jones was noted to be at risk for suicide and a high risk for violence (Tr. 294, 301).

Based on his clinical observations, Jones's report and the above mental health history, Dr. Klem diagnosed bipolar disorder NOS and anxiety disorder NOS (Tr. 378). Dr. Klem found that Jones had a good ability to interact with her three children, but otherwise had a poor relationship with her family members and could "be expected to have considerable difficulty and distress" with people in general (Tr. 379). In this respect, Dr. Klem continued to observe that Jones "has difficulty interacting with others and avoids others." (Id.). He added that when she is around people and under stress, Jones "can be expected to be angry." (Id.). He concluded in his report, similar to Dr. Huett, that "her ability to adapt to pressures, and [to] changes normally found in a day-to-day work setting is likely poor-to-fair at this time." (Tr. 379).

The above review of the consultative examination reports of Drs. Huett and Klem is significant for several reasons. These two psychological consultative examination reports are the only ones of record. Both reports are consistent with one another. They reveal an ongoing history of severe mental illness that included bipolar disorder, depression, anxiety disorder and

agoraphobic behaviors over a decade-long period since the claimant's teenage years. Her ongoing mental illness has resulted in repeated inpatient psychiatric hospitalization on at least four occasions that include time periods both prior to and after the alleged onset date of her disability. The two reports reflect not only chronic severe depression along with isolation, but emotional instability characterized by violent and otherwise confrontational outbursts that have involved members of the general public and co-workers. These facts led both Drs. Huett and Klem to find marked restrictions in the ability of Jones to handle stress in the day-to-day work environment, as well as marked restrictions in her ability to interact cooperatively with her co-workers and supervisors.

The ALJ in his hearing decision at p. 9 dismisses both of the consultative examination reports to varying degrees. The consultative psychological examination report of Dr. Huett is given no weight. The ALJ rejects Dr. Huett's conclusions without any discussion of the substance of the doctor's report because the report was prepared in November of 2008 "over three years prior to the claimant's alleged onset date of disability." (Id.). Otherwise, the ALJ makes no mention of Dr. Huett's observations or her professional conclusions, including those involving marked work limitations.

ALJ Mather in the same portion of his decision makes only limited reference to the psychological consultative examination report of Dr. Klem. After noting the doctor's findings that Jones has considerable difficulty and distress with people and only a poor-to-fair ability to adapt to pressures and changes normally found in the day-to-day work setting, the ALJ continues simply to observe that "neither Dr. Klem's own findings nor the record as a whole supports the remainder of his opinion" without identifying that remainder. Otherwise, the hearing decision

notes only that Dr. Klem's opinion is "quite conclusory," that it relies heavily on the subjective reports of symptoms of the claimant, which the record as a whole does not corroborate."

While the ALJ in his hearing decision at p. 9 makes repeated general references to the "record as a whole" to reject Dr. Klem's opinion concerning Jones's work-related restrictions arising from her ADHD, severe bipolar disorder, anxiety disorder and panic disorder with agoraphobia, examination of the remainder of the opinion reveals that the "rest of the record" heavily relied upon by ALJ Mather, consists essentially of Jones's statements concerning her ability to care for her children in the home, do housework without reminders, perform self-care, and talk on the phone (Tr. 26).

Nowhere in the hearing decision does the ALJ explain how such limited in-home behaviors logically relate to an ability to engage in substantial gainful activity in the workplace. Most of the behaviors identified, i.e., house cleaning, cooking and childcare, relate primarily to the exertional capacity of the claimant, rather than to her non-exertional limitations arising from her numerous mental impairments. In other words, the fact that the claimant can clean or cook, when isolated in her own home, in no fashion calls into question the marked restrictions on her ability to peacefully and cooperatively interact with co-workers or supervisors in the workplace.

It must be remembered in this regard that the record reveals that Jones suffers from a documented history of agoraphobia which causes her to isolate herself in her home in order to avoid interaction with the public. This panic disorder with agoraphobia was found by the ALJ to be a severe condition, and was confirmed in the treatment records of Seven Counties Services, as well (Tr. 21, 284-285). Jones repeatedly reported to her mental healthcare providers at Seven Counties that she is afraid to leave her home, does not like to leave, and in fact, is so reluctant to

leave her house that she will pay her mother to go to the market for her in order to avoid doing so herself. (Tr. 282, 283, 284, 285).

Indeed, her fear of leaving her home is so extreme that Jones advised Dr. Klem that "a lot of the times [sic] I can't get to the doctors' appointments because I can't bring myself up [sic] on getting out of [the] house." (Tr. 374). Thus, the fact that Jones can minimally function and interact with her minor children within the protective confines of her home says little-to-nothing about her ability to function and interact with co-workers in the workplace. Review of the "record as a whole" even calls into question Jones's ability to function peacefully within the home in the context of her family interaction.

Jones has no ongoing, conflict-free relationship with any of the adult members of her family (Tr. 282-284). She admits that she has no friends and that she has poor relationships with her neighbors (Tr. 376). On two separate occasions domestic violence orders have been entered due to Jones's physical conflict with her ex-husband and with her then current boyfriend (Tr. 270, 283-85). The latter incident of violence led to court-ordered treatment not only for Jones, but for all three of her three children as well. (Tr. 283). Jones's family history reveals ongoing conflict with her oldest teenage daughter, who herself received inpatient psychiatric treatment at Our Lady of Peace for a 6-month period, due to her own acting out and destructive behaviors (Tr. 350-51, 388).

In March of 2012, Jones reported to her therapist at Seven Counties, Linda Leavitt, that she was having an increase in her anxiety and depression over the return of her oldest daughter to the family. (Tr. 351). This increased anxiety and depression resulted in Jones experiencing chest pain and minor panic attacks at the mere thought of her own daughter's return to the family. (Tr. 351). Accordingly, a careful examination of the record reveals that Jones's interaction with her

own children in the home was itself not conflict-free, but rather exacerbated her symptoms of anxiety, depression and agoraphobia.

The limiting effect of Jones's panic disorder with agoraphobia is further confirmed in the records of Seven Counties Services as well. Jones, as noted, indicated that she is highly reluctant to leave her home unescorted. She ceased attending church five years prior to her alleged onset and only goes out to take her children to school (Tr. 270, 276, 282-284, 390). The extent of her agoraphobic isolation is reflected in her treatment goals at Seven Counties Services. One of the main goals to be achieved through mental health treatment was simply for Jones to engage in two activities outside her home per week (Tr. 364). Accordingly, the fact that Jones was minimally functional within the confines of her own home when interacting with her own children, would not seem to be substantial evidence on which to reject the consultative examination report of Dr. Klem, whose conclusions were confirmed by the earlier consultative psychological examination report prepared by Dr. Huett.

Although an ALJ is not required by regulation to state good reasons for rejecting the opinions of consultative examiners who are not treating physicians, *Burton v. Astrue*, 2013 WL 85073 at *6 (E.D. Ky. Jan. 7, 2013), the record must nonetheless set forth some reasonable basis on which to do so. The record as reviewed appears to the Court to contain no such basis. Indeed when one examines the remainder of the record it merely serves to underscore the deficient nature of the challenged finding of fact.

The only other opinions offered are those of the two state agency non-examining psychologists, Dr. Jane Brake (Tr. 97-102, 112-115) and Dr. Marvin Blase (Tr. 129-131). The ALJ in his hearing decision acknowledges that as non-examining medical sources, the opinions of Dr. Brake and Dr. Blase "do not as a general matter deserve as much weight as those of

examining or treating medical sources…." (Tr.27). Nonetheless, the hearing decision continues to conclude that their opinions "do deserve some weight, particularly in a case like this in which there exists a number of other reasons to reach similar conclusions (as explained throughout this decision)." The hearing decision however does not identify with meaningful specificity those "other reasons to reach similar conclusions." At most, the ALJ indicates only that the findings of the non-examining state agency medical sources are "generally consistent with the limitations contained in the Residual Functional Capacity set forth above" and then proceeds to give the opinions of Drs. Brake and Blase significant weight "insofar as they are consistent with the evidence of record as a whole…." (Tr. 27).

Examination of the opinions of the two non-examining state agency physicians reveals that they rest on the same flawed and unsupported reasoning of the hearing decision. Both Drs. Brake and Blase rest their adverse conclusions based on the claimant's ability to "take care of her children, get along with acquaintances, shop… do… household chores and function… adequately with limited contact with the general public." (Tr. 114, 131). As noted above, Jones's ability to function minimally within the confines of her home, and to care for her children, would not seem to be a substantial basis on which to conclude that she remains capable of tolerating the stress of day-to-day work and interacting cooperatively and peacefully with co-workers outside the setting of her own home. The record as a whole, when fully and fairly examined, repeatedly demonstrates that Jones is unable to function adequately without conflict in a work setting. Her limited employment history, which includes termination from employment for a work-related conflict (Tr. 371) refutes the notion that her limited ability to function within the home when interacting with her children constitutes a substantial basis on which to reject her disability claims.

Although Jones has at various times briefly held miscellaneous jobs (Tr. 214, 227), the record reveals that none of those jobs was of an enduring nature, with most lasting merely a matter of a few months at most (Id.). Indeed, Jones reported that she was discharged from attempted employment as a bartender after only four days following a work-related conflict (Tr. 371). Otherwise, Jones's only recent employment history appears to be a post-onset, failed work attempt as a home healthcare attendant working part-time for approximately 9 hours per week (Tr. 37-39). This position involved no interaction with supervisors or co-workers, and included primarily in-home cleaning and cooking for 9 hours per week (Id.). Accordingly, the position appears to fall outside the non-exertional limitations contained in the RFC determination of the ALJ (Tr. 23-24).

The hearing decision of the ALJ at finding of fact no. 5 also appears to rely upon the treatment and medication history of the claimant as a basis on which to reject the claimant's statements regarding the intensity, persistence and limiting effects of the symptoms arising from her AHDH, depression, bipolar disorder, anxiety disorder and panic disorder with agoraphobia (Tr. 21, 25-27). The Commissioner in her fact and law summary likewise argues that Jones's failure to attend mental health treatment without lapse and her documented noncompliance with her psychotropic medication regimen (Xanax, Lithium, Effexor and Seroquel) support the ALJ's adverse RFC determination at finding of fact no. 5.

Once again, a close examination of the claimant's treatment history along with her medication history reveals that any lapse in compliance with treatment or with medication are potentially due to the severity of her mental impairments and her limited access to health care. Jones reported early on that she had difficulty in attending doctors' appointments due to her agoraphobia (Tr. 374). Her documented reluctance to leave her home without escort appears to

substantially explain, at least in part, her missed therapy appointments. While the record indeed does reflect that Jones did repeatedly miss mental health counseling sessions (Tr. 287, 335, 336, 342, 347, 352, 355), such absences, in the face of Jones's extreme reluctance to leave her home except in the most limited circumstances, do not inevitably, or even logically, support an inference that her symptoms of severe mental illness are overstated or are otherwise unsupported in the record. To the contrary her absences due to her documented agoraphobia would seem to be supportive of the intensity, persistence and limiting effects of those symptoms. Also, it is noteworthy that several of the missed appointments appear to have occurred during the time that Jones voluntarily surrendered herself for inpatient psychiatric treatment in May of 2012 after she physically assaulted a delivery person and spit in the face of one of the counselors at Seven Counties Services during an altercation in the parking lot at the facility (Tr. 336-342).

Examination of the existing treatment notes of record also calls into serious question the efficacy of the mental health treatment that Jones did receive at Seven Counties Services. The more recent progress notes of Nov. 7, 2012 (Tr. 388-91), reveal Jones to be "more depressed" and isolating with "poor mood swings," few friends and not attending group counseling (Id.). At most, Jones appeared to experience a brief period of stability immediately after she was released from inpatient psychiatric treatment at Our Lady of Peace Hospital where she was noted to make some progress (Tr. 337, 340). Prior to that hospitalization, however, Jones, despite therapy at Seven Counties Services, had reported increased depression, sadness, difficulty falling asleep, increased anxiety, minor panic attacks and difficulty relaxing (Tr. 350-354).

It is true also that Jones on several occasions was noted to be noncompliant with her medications (Tr. 293, 327, 337, 346, 351, 389). Her noncompliance appears to be explained, at least in part, by her limited medical coverage. The unavailability of medical coverage is

mentioned directly in relation to her medication noncompliance by her treating therapist, Linda Leavitt, in her treatment note dated March 19, 2012 (Tr. 350-351). In that treatment note, Leavitt related that she "explored possible need to get back on medications and what options she [Jones] has **due to no medical coverage**." (Tr. 351) (emphasis added).

Treatment notes of Leavitt from the following month dated April 25, 2012, again refer to problems with Jones obtaining medication for her severe mental illness (Tr. 345-46). In this respect, Leavitt notes that the claimant "attempted to get medication from U of L-Seven Counties who will not prescribe medications for her anxiety." (Tr. 346). Thus, it appears to the Court that in certain instances the claimant's noncompliance was directly due to the unavailability of medical insurance and the unwillingness of healthcare providers to otherwise provide medication to her. While it is true that in the protected setting of a psychiatric hospital, when provided with psychotropic medication, Jones has temporarily experienced brief reduction in her mental health symptoms, showing a "fairly decent therapeutic response," outside such a protected setting, even with the benefit of medication, the record repeatedly reveals that she is marginally functional at best even within the confines of her own home. Her occasional noncompliance with therapy and medication appears to the Court to possibly be a direct result of the severity of her agoraphobic symptoms, combined with her limited access to medical insurance as reflected in the record.

At a minimum SSR 82-59 required the ALJ to adequately develop the record to explain such noncompliance and the impact of her mental illness and limited access to medication. Ruling 82-59 expressly states that "[t]he claimant …should be given an opportunity to fully express the specific reasons(s) for not following the prescribed treatment. SSR 82-59. 1984 WL 31384 at *2 (SSA). Further, it notes that "[d]etailed questioning may be needed to identify and clarify the essential factors of refusal." *Id.* The same section of SSR 82-59 continues to

immediately advise that "[t]he record must reflect as clearly and accurately as possible the claimant's …reason(s) for failing to follow the prescribed treatment." SSR 82-59, 1984 WL 31384 at *2 (1982).

The record as developed here substantially fails to comply with the express requirements of SSR 82-59 and the related federal regulations. *See* 20 C.F.R. § 404.1530( c ); 416.930( c )(acceptable reasons for failure to follow prescribed treatment). The failure to adequately develop this critical aspect of the record certainly cannot be characterized as inconsequential or as harmless error. *See, Renneker v. Astrue,* 2011 WL 2559515 *11-13("The ALJ erred by determining that plaintiff was noncompliant with her treatment and medication without addressing whether her noncompliance was a result of one of her severe mental impairments."); *Carr v. Colvin,* 2013 WL 1309094 at *23 ("Where SSA makes a determination of "failure," [to comply with prescribed treatment] a determination must also be made as to whether or not failure to follow prescribed treatment is justifiable.")

For the above reasons, the Court concludes that remand to the Commissioner for adequate development of the record is essential to the just resolution of Jones' claims for DIB and SSI benefits. A serious question exists whether substantial evidence supports the adverse determination of the Commissioner with respect to finding of fact no. 5. A reasonable mind would not accept the cited portions of the record as being adequate to support the adverse RFC determination of the ALJ as the record presently stands. The mere ability of the claimant to care for her children in the protective setting of her home would not seem to be substantial evidence that she remains capable of performing substantial gainful activity outside that home even with the limitations set forth in the challenged finding-- particularly in light of the contrary conclusions of both of the consultative psychological examiners, both of whom assessed marked

restrictions in the ability of the claimant to interact cooperatively without confrontation with co-workers and supervisors in a work setting.

The claimant's noncompliance with treatment and medication cannot support the adverse determination, without substantial development of all the underlying reasons for her noncompliance, particularly where the record establishes that the claimant's severe mental impairments of agoraphobia with panic disorder, along with her limited access to medical insurance, appears to have resulted in such noncompliance on multiple occasions. *See, Worden v. Comm'r,* 2009 WL 816457 at *4-5 (S.D. Ohio Mar. 26, 2009)(reversing the decision of the Commissioner and remanding for payment of benefits where the claimant was diagnosed with panic disorder with agoraphobia and major depression, and her counselor reported that the claimant experienced panic attacks, could not leave her home alone and occasionally missed appointments because there was no one to transport her).

The fact that the hearing decision of the ALJ appears to omit discussion of substantial portions of the record that directly undermine the findings of the ALJ in this respect only serves in the Court's view to underscore the genuine need for remand. Accordingly, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner will be set aside, and the case remanded for further factual development as requested by the claimant. *See, Melkonyan v. Sullivan,* 501 U.S. 89, 99-100 (1991); *Hollon v. Comm'r,* 447 F.3d 477, 483 (6th Cir. 2006); *Franson v. Comm'r,* 556 F. Supp. 2d 716, 724-25 (W.D. Mich. 2008).

Cc:     Counsel of Record